**Connie HILL and William Hill, Plaintiffs,**

v.

**SEARLE LABORATORIES, A DIVISION OF SEARLE PHARMACEUTICALS, INC., G.D. Searle & Company; Searle & Company; John Doe I and John Doe II, Defendants.**

**No. B–C–86–119.**

United States District Court, E.D. Arkansas, Batesville Division.

May 25, 1988.

As Amended Aug. 8, 1988.

David Hodges, Little Rock, Ark., for plaintiffs.

Elizabeth J. Robben, Friday, Eldredge & Clark, Little Rock, Ark., for defendants.

## ORDER

ROY, District Judge.

Before the Court is the Motion for Summary Judgment filed by defendants G.D. Searle & Company and Searle & Company. The plaintiff has responded, and the matter is now ripe for determination.

Plaintiff, Connie Hill, initiated this action alleging that defendant, Searle Laboratories, the manufacturer and supplier of a copper intrauterine device (IUD) called a CU–7 had manufactured/supplied a product which was unreasonably dangerous and/or negligently designed.

The following statement of facts is drawn from those paragraphs in defendants' statement of material facts which are not disputed by plaintiffs.

The plaintiff was implanted with the CU–7 in July of 1981 at the Independence County Health Department Unit in Batesville, Arkansas. In October of 1983 plaintiff returned to the Batesville Health De-

partment Unit believing that she was pregnant and that her CU–7 was still in place. The fact of her pregnancy was confirmed. On May 31, 1984 Mrs. Hill gave birth to her third child. On June 1, 1984, Mrs. Hill was taken to surgery for a tubal ligation. During this procedure her treating physician, Dr. Roland Reynolds, determined that the CU–7 had penetrated Mrs. Hill's uterus and was partially embedded in her small bowel. Accordingly, in addition to the tubal ligation, Dr. Reynolds removed the CU–7 from Mrs. Hill.

A CU–7 is a copper containing contraceptive manufactured by Searle. It is a prescription drug requiring the order of a physician to be used, and must be inserted by a physician. Information about the CU–7 was submitted to the United States Food and Drug Administration (FDA) in the form of a new drug application (NDA), pursuant to 21 C.F.R. § 310.502.

In February, 1974 the FDA approved the new drug application, finding the CU–7 to be safe and effective, and granted full approval to Searle to begin marketing the CU–7. The FDA also approved the contents of the package inserts or labeling which accompanied the CU–7 as well as the patient brochure which was subsequently developed.

In 1977, the FDA promulgated class labeling for use with all IUDs. These regulations mandate the warnings and information which must be provided in the package inserts and patient brochures. 21 C.F.R. § 310.502(b). Searle not only complied with these regulations, it also included additional information.

Searle's product literature for physicians included the following:

*Warnings*

(5) *Perforation*—Partial or total perforation of the uterine wall or cervix may occur with the use of the CU–7 usually during insertions into patients sooner than 2 months after abortion or delivery, or in the uterine cavities too small for the CU–7. The possibility of perforation must be kept in mind during insertion and at the time of any subsequent examination. If perforation occurs, laparoto-my or laparoscopy should be performed as soon as medically feasible and the CU–7 removed. Abdominal adhesions, intestinal penetration, intestinal obstruction and local inflammatory reaction with abscess formation and erosion of adjacent viscera may result if the CU–7 is left in the peritoneal cavity.

The same labeling also contained this information:

*Adverse Reactions*

Perforations of uterus and cervix have occurred. Perforation into the abdomen has been followed by abdominal adhesions, intestinal penetration, intestinal obstruction, local inflammatory reaction with abscess formation and erosion of adjacent viscera.

(CU–7 package inserts for physicians February, 1981 attached as part of Exhibit D to Searle's Response to Plaintiffs' Interrogatories and Second Request for Production of Documents.)

Dr. Dennis Davidson, who inserted the IUD in the present case, was fully aware of the risk of perforation associated with the use of a CU–7 or any IUD. Dr. Davidson was also familiar and aware of the contents of the product literature accompanying the CU–7 and believed that it adequately informed him of the potential risks associated with the use of the CU–7.

Dr. Roland Reynolds, plaintiffs' expert witness, stated in his deposition that he was fully aware of the risk of perforation associated with the use of an IUD, and that he was as familiar with the product literature accompanying the CU–7 and believes in his medical opinion that the warnings contained therein were adequate to apprise physicians of the risks associated with the use of the CU–7. Dr. Reynolds does not believe that Searle did anything wrong in the manufacture and distribution of the Copper 7, nor does he believe that Searle was negligent in any way in connection with the manufacture, sale and distribution of the Copper 7.

In their brief, defendant contends that the only basis alleged in the complaint or revealed in discovery has been the plain-

tiff's claim that the defendants failed to adequately warn that there existed a risk of perforation of the uterus associated with the use of a CU–7 IUD.

In the plaintiff's response to defendant's statement of material facts as to which there is no dispute, plaintiff claims that Searle did, in fact, conduct extensive testing of the CU–7 but the results of these tests were falsified and that false information and literature containing false information about the CU–7 were submitted to the United States Food and Drug Administration in the form of a new drug application, pursuant to 21 C.F.R. § 310.502. In his brief, plaintiff merely contends that there are fact questions as to whether defendant properly prepared the drug and issued proper directions and warnings. However, plaintiffs have failed to support this allegation with any affidavits, answers and interrogatories, depositions, or other materials, while defendant has presented the deposition of plaintiff's own expert witness who stated that in his opinion defendant did nothing wrong in the manufacture and distribution of the CU–7.

In ruling on this motion for summary judgment, the Court is guided by a more liberal attitude displayed by the Eighth Circuit and the Supreme Court in the granting of such motions. In *City of Mt. Pleasant v. Associated Electric Cooperative, Inc.,* 838 F.2d 268 (8th Cir.1988), the Eighth Circuit noted:

> In any case, whatever the meaning of our earlier cases, a trilogy of recent Supreme Court opinions demonstrates that we should be somewhat more hospitable to summary judgments than in the past. The motion for summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact.

> In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court held that the burden on the party moving for summary judgment is only to demonstrate, *i.e.,* "[to] point [ ] out to the District Court,"

*id.* 106 S.Ct. at 2554, that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). If the respondent fails to carry that burden, summary judgment would be granted.

*Id.* at 273–74.

The Supreme Court held that under Rule 56(c) of the Federal Rules of Civil Procedure, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In *Hufsmith v. Weaver,* 817 F.2d 455 (8th Cir.1987), the Court discussed further the holding in *Liberty Lobby:*

> In *Liberty Lobby,* the Supreme Court defined "material" facts as those "that might affect the outcome of the suit under the governing law," and explained that "while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* The court also noted that the material fact must be "genuine," i.e., "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court thus stated that if the evidence is merely colorable or is not significantly probative, summary judgment is appropriate. *Id.* 106 S.Ct. at 2511 (citations omitted); *see Celotex Corp. v. Catrett*

[477] U.S. [317], 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)

*Id.* at 460, n. 7.

█ Defendants argue first that the Copper 7 is a prescription product and is a comment k product as a matter of law. In support of this argument, defendants state that Arkansas has based its strict product liability statute (Ark.Code.Ann. §§ 16–116–101 *et seq.*) (the "Arkansas Product Liability Act of 1979") on Section 402A of the *Restatement (Second) of Torts* ("Section 402A") which imposes strict liability on the manufacturer of a defective or unreasonably dangerous product. Comment k to Section 402A provides an exception to the strict liability rule, however, in the case of an "unavoidably unsafe" product.[1] An unavoidably unsafe product is a product which cannot be made absolutely safe for its intended and ordinary use. Comment k provides that if properly prepared and marketed, such a product is not, by definition, defective or unreasonably dangerous.

The defendant concedes that the Arkansas' appellate courts have not had an occasion to decide whether to adopt comment k, but urge that there is no reason to believe that Arkansas would depart from the rule embodied in comment k.[2] Defendant cites to other courts which have considered the issue and have overwhelmingly adopted comment k in unavoidably unsafe product cases.[3] Defendants also cite to an Eighth Circuit case, *DeLuryea v. Winthrop Laboratories,* 697 F.2d 222 (8th Cir.1983), which specifically and favorably referenced the application of comment k to prescription drug warning cases, although it did not expressly state that it was in fact applying comment k in that case. Defendants have cited to other cases in which comment k has been applied to prescription intrauterine devices.[4]

Comment k reflects a policy judgment that the availability of certain products, such as prescription drugs, is so important to society that those who manufacture these products should not be subject to strict liability for resulting injuries. *Gaston v. Hunter,* 121 Ariz. 33, 588 P.2d 326, 339 (1978).

---

1. Comment k to Section 402A specifically provides that:

   "There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper direction and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot be legally sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for

   unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

2. *Brewer v. Jeep Corp.,* 724 F.2d 653 (8th Cir. 1983); *French v. Grove Manufacturing Co.,* 656 F.2d 295 (8th Cir.1981); *Berkeley Pump Co. v. Reed–Joseph Land Co.,* 279 Ark. 384, 653 S.W.2d 128 (1983); *Southern Co. v. Graham,* 271 Ark. 223, 607 S.W.2d 677 (1980); *General Motors Corp. v. Tate,* 257 Ark. 347, 516 S.W.2d 602 (1974).

3. Some of the cases cited are: *Lindsay v. Ortho Pharmaceutical Corp.,* 637 F.2d 87 (2d Cir.1980); *Werner v. Upjohn Company, Inc.,* 628 F.2d 848 (4th Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981); *Basko v. Sterling Drug, Inc.,* 416 F.2d 417 (2d Cir.1969); *Davis v. Wyeth Laboratories, Inc.,* 399 F.2d 121, 128 (9th Cir.1968); *Wolfgruber v. Upjohn Co.,* 72 A.D.2d 59, 423 N.Y.S.2d 95 (1979), *aff'd,* 52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980).

4. *See, e.g., Collins v. Ortho Pharmaceutical Corp.,* 195 Cal.App.3d 1539, 231 Cal.Rptr. 396 (1986, petition for review granted —— Cal.3d ——, 234 Cal.Rptr. 596, 732 P.2d 542, Cal.1987) (Lippes Loop IUD); *McKee v. Moore,* 648 P.2d 21, 24 (Okla.1982) (Lippes Loop IUD); *Terhune v. A.H. Robins Co.,* 90 Wash.2d 9, 577 P.2d 975 (1978) (Dalkon Shield IUD).

Plaintiffs argue that Arkansas has not adopted comment k and, therefore, the defendants may be held strictly liable.

The Court has an obligation to determine what the Arkansas courts might decide if confronted with the present factual situation. The Court has reviewed the analysis given by several courts that have considered this, and finds that it is likely that the Arkansas Supreme Court would adopt comment k with respect to not only prescription drugs, but also as to intrauterine contraceptive devices. In *Terhune v. A.H. Robins Co.*, 90 Wash.2d 9, 577 P.2d 975 (1978), the Court was faced with the argument that even if comment k was adopted, it would not apply to IUDs. The Court stated:

[3] It is further urged that products such as the Dalkon Shield should be excluded from the class covered by comment *k* because federal law does not provide the public with the added protection which is attendant upon the approval of a drug by the Food and Drug Administration. We are told that such products may be dispensed without the rigorous prior testing which drugs must undergo.

While a sound public policy might indeed dictate that such testing be undertaken before any product to be used on the human body is released in commerce, a decision of that kind rests with the legislative body. The principles stated in comment *k* do not rest upon a finding or an assumption that all drugs, vaccines or other products obtainable only through a physician have been tested by the Food and Drug Administration. Rather they have their basis in the character of the medical profession and the relationship which exists between the manufacturer, the physician and the patient. We think it safe to surmise that ordinarily a physician will not prescribe or utilize a product which he does not consider reasonably safe, and that he will take into account the amount of testing, or lack thereof, which has been done with respect to the product. But in any event, because it is he who finally controls the dispensing of the product, it is just that he should be fully advised of the characteristics and dangers of the products and that the manufacturer should not be held to account if it has done its duty in this regard, even though the physician decides, in the exercise of his own judgment, to withhold the information from his patient.

In the instant case, the physician was admittedly aware of the danger of perforation, but apparently he decided that the risk was so minimal that it was not significant. In fact, the evidence showed that perforation, while it may well occur if the insertion procedure is not followed precisely, is comparatively rare.

[4] It is our conclusion that a manufacturer of a product such as the Dalkon Shield (if it qualifies otherwise under comment *k*), which is obtainable only through the services of a physician, fulfills its duty if it warns the physician of the dangers attendant upon its use, and need not warn the patient as well.

The undisputed evidence showed that the medical profession regarded the Dalkon Shield, at the time it was recommended by the plaintiffs' physician, as an acceptable method of contraception, being less troublesome and more effective than other available means, and the plaintiffs have not questioned the importance and desirability of birth control. The superior court quite properly held as a matter of law that the shield was not unreasonably dangerous or defective, as defined in comment *k*.

Based on the foregoing, the Court finds it reasonable to conclude that the Arkansas courts would adopt comment k and make it applicable to IUD cases.

■ Defendant next argues that comment k applies to a negligent design claim under Arkansas law. In *DeLuryea v. Winthrop Laboratories, supra,* the Eighth Circuit held that proper instructions under Arkansas law as to negligence and strict liability in a prescription drug warning case were so strikingly similar that "[t]he standard for liability under strict liability and negligence is essentially the same." 697 F.2d at 229. The Court finds it appropriate to conclude that comment k also necessarily insulates a drug manufacturer who adequately warns of the risks of its drugs

from liability in negligence or design defects.

■ The Court also finds the same logic applies to the breach of warranty claim. A breach of warranty claim is subsumed by an adequate warning of the product's adverse reactions. As the court observed in *Fellows v. USV Pharmaceutical Corp.*, 502 F.Supp. 297 (D.Md.1980):

> The reason why certain drugs are available by prescription is that their use is not completely safe. Plaintiff's warranty theory, therefore, is untenable for it would impose liability on manufacturers of prescription drugs when the consumer suffers any harmful side effects, even though the manufacturer has given a legally adequate warning. Such a theory "would make the drug manufacturer an insurer of the drug user's health." ...
> Although it is clear that there are risks associated with using diorden, this does not make the drug unfit "for the ordinary purposes for which the goods are used." (citations omitted)

*Id.* at 299–300.

■ There is no express warranty that a particular side effect will not occur where the manufacturer specifically warns of such a side effect. *Dunkin v. Syntex Laboratories, Inc.*, 443 F.Supp. 121, 125–26 (W.D.Tenn.1977). The Court finds that Mrs. Hill's warranty claim is governed by the same standard applicable to her strict liability and negligence warning claims.

The next question relates to what kind of warning is required to be given and whether it was adequate. In the present case, Dr. Dennis Davidson, who inserted the IUD, stated in his deposition that he was fully aware of the risk of perforation associated with the use of a CU–7 or any IUD. He was also familiar and aware of the contents of the product literature accompanying the CU–7 and believed that it adequately informed him of the potential risks associated with the use of the CU–7. Even plaintiff's expert witness stated in his deposition that he was fully aware of the risk of perforation associated with the use of an IUD, and that he was familiar with the product literature accompanying the CU–7. In his medical opinion he believed that the

warnings contained therein were adequate to apprise physicians of the risks associated with the use of the CU–7. Dr. Reynolds does not believe that Searle did anything wrong in the manufacturer and distribution of the CU–7, nor does he believe that Searle was negligent in any way in connection with the manufacture, sale and distribution of the CU–7.

■ Plaintiff's contention of inadequate warnings is based upon the fact that she was inadequately advised as to the different forms of contraception methods available and the risks incident to each. Defendant contends that although the "learned intermediary" rule has apparently not been directly addressed by the Arkansas Supreme Court, the Eighth Circuit Court's holding in *DeLuryea v. Winthrop Laboratories, supra,* demonstrates that Arkansas law is in accord with the nearly universal rule that a manufacturer of a prescription product cannot be liable if it adequately warned the prescribing physician of the product's potential adverse reactions.

> This court in *Sterling Drug, Inc. v. Cornish,* 370 F.2d 82 (8th Cir.1966), discussed the importance of warning prescribing physicians as follows:
>
> > [T]he purchaser's doctor is a learned intermediary between the purchase and the manufacturer. If the doctor is properly warned of the possibility of a side effect in some patients, and is advised of the symptoms normally accompanying the side effect, there is an excellent chance that injury to the patient can be avoided. This is particularly true if the injury takes place slowly, as is the case with the injury in question here. 370 F.2d at 85.

*DeLuryea,* 697 F.2d at 225.

A review of the cases cited by the defendant leads the Court to conclude that there is no reason to doubt that the Arkansas Supreme Court would follow this majority rule.

Although the adequacy of a warning is generally a question of fact for the jury, numerous courts have quite appropriately held that a manufacturer is entitled to summary judgment as a matter of law where

its warning was clearly adequate. *See, e.g., Weinberger v. Bristol–Myers Co.,* 652 F.Supp. 187, 190 (D.Md.1986); *Hurley v. Lederle Laboratories,* 651 F.Supp. 993, 1002–03 (E.D.Tex.1986); *Goodson v. Searle Laboratories,* 471 F.Supp. 546, 549 (D.Conn.1978); *Dunkin v. Syntex Laboratories, Inc.,* 443 F.Supp. 121, 124 (W.D. Tenn.1977).

In the instant case, Mrs. Hill claims she did not receive the patient booklet. She acknowledges, however, in her deposition that she signed a form for the health department which states that she understood, *inter alia,* that there was a risk that her uterus would be perforated by the insertion of an IUD. She also acknowledges that she expected Dr. Davidson to inform her if it was not an appropriate method of birth control for her. The plaintiffs' own expert, Dr. Roland Reynolds, has testified that the warnings pertaining to perforation of the uterus both in the product literature accompanying the CU–7 was adequate. Dr. Davidson, the inserting physician, testified that at the time he inserted the CU–7 in Mrs. Hill, he was well aware of the risk of perforation of her uterus both from his training and experience as a physician and from the physician warning package insert which was included with the CU–7. Moreover, Dr. Davidson testified not only that the warnings provided were adequate, but that he considered these risks in determining whether Mrs. Hill was an appropriate candidate for an IUD and that he would have informed her of those risks both verbally and by providing her with the patient booklet.

The pleadings show that Searle did not fail to adequately warn Dr. Davidson of the risk of uterine perforation and complications. The adequacy of the warning must be viewed in light of the universal knowledge of the medical profession that certain gynecological processes create a risk of perforation. Specifically, the package insert that Searle provided in 1981 with the CU–7 explicitly stated that perforation of the uterus was a possibility. An even more elementary discussion was contained in the patient brochure that Searle distributed to physicians with the CU–7.

Based on the above, it is clear that under any theory of liability the duty owed by Searle was to provide adequate warnings to Mrs. Hill's prescribing physician, Dr. Davidson, and that Searle adequately fulfilled that duty. There is no evidence to the contrary and, accordingly, Searle is entitled to summary judgment on the plaintiffs' complaint.

Therefore, based upon the foregoing, the Court grants the defendants' motion for summary judgment in favor of defendants, G.D. Searle & Company and Searle & Company.