**Ronald POLLARD and Sharon Pollard, Respondents–Cross Appellants,**

v.

**Richard H. ASHBY, M.D., and Richard H. Ashby, P.C., Respondents,**

**and**

**Smith Laboratories, Inc., Appellant.**

**No. 54190.**

Missouri Court of Appeals, Eastern District, En Banc.

May 22, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 2, 1990.

Application to Transfer Denied Sept. 11, 1990.

Frank N. Gundlach, Thomas B. Weaver, St. Louis, for appellant.

Richard L. Hughes, Mogab & Hughes Attorneys, P.C., St. Louis, for Ronald and Sharon Pollard.

Joseph Kortenhof, St. Louis, for Richard H. Ashby et al.

GARY M. GAERTNER, Judge.

In July 1981, respondent, Ronald Pollard, the forty year old plaintiff, injured his back in a lifting accident at work. The plaintiff received treatment from a chiropractor which improved his condition to a degree. The plaintiff also saw a family physician and a specialist for his back problem. After the plaintiff received some conservative treatment resulting in no apparent effect, the plaintiff saw Dr. Hawk, a neurologist, who also prescribed conservative treatment. Dr. Hawk eventually ordered a CAT scan to be performed on plaintiff. The CAT scan revealed that plaintiff had a lumbar disc rupture.

Dr. Hawk referred plaintiff to defendant, Dr. Ashby, to discuss the nature of treatment through chemonucleolysis. Chemonucleolysis is a process in which chymopapain [1] is injected directly into the nucleus pulposus of the damaged disc. The enzyme in the chymopapain shrinks the disc thereby eliminating the pressure and pain caused by the damaged disc. Chemonucleolysis provides an alternative to laminectomy or dissectomy, both invasive surgical procedures. Plaintiff eventually decided to undergo the chemonucleolysis treatment.

In October 1983, Dr. Ashby injected plaintiff with a dose of chymodiactin.[2]

---

1. Chymopapain is derived from the papaya plant. Chymopapain contains an enzyme which is used in the treatment of herniated discs.

2. Chymodiactin is the brand name for a drug developed and manufactured by defendant Smith Laboratories (Smith Labs). Chymodiactin is a form of the chymopapain enzyme.

Soon after the injection, the plaintiff began to display symptoms characteristic of a subarachnoid hemorrhage,[3] *i.e.* poor balance, blurred vision, severe headaches and difficulty speaking. Additionally, plaintiff had high blood pressure, complained of pain, developed an inflammation of the pancreas, and displayed symptoms of right hemiparesis. CAT scans showed a small area of left frontal hypodensity consistent with a stroke in the left frontal lobe of the brain.[4] Plaintiff spent several days in intensive care and a total of four weeks in St. Joseph's Hospital. Thereafter, plaintiff received rehabilitative physical therapy at Deaconess Hospital for an additional four weeks. Shortly after being discharged from Deaconess Hospital, plaintiff returned to work.

Plaintiff complained of continued pain in his back. Additionally, plaintiff suffered from pain in his right leg, headaches, occasional incontinence and sexual dysfunction. Plaintiff's disabilities led to decreased job performance and decline in sales and customer satisfaction. In June 1984, plaintiffs, Ronald and Sharon Pollard, brought a medical malpractice action against Dr. Ashby. Plaintiffs later amended their petition to assert several claims against Smith Labs; a strict liability product defect action, a strict liability failure to warn action, and a negligent failure to warn action. After a two week trial, plaintiffs' case against Smith Labs was submitted to the jury only on the issue of strict liability failure to warn. The jury returned a verdict against Smith Labs in favor of Ronald Pollard in the amount of $700,000. The jury found in favor of Dr. Ashby on Ronald Pollard's claim and in favor of both defendants on Sharon Pollard's claim, for loss of consortium.

The central issue in this case is whether the trial court properly instructed the jury as to plaintiffs' strict liability failure to warn claim. The trial court submitted the case to the jury using MAI 25.05:

Your verdict must be for plaintiff Ronald Pollard and against defendant Smith Laboratories, Inc., if you believe:

First, defendant Smith Laboratories, Inc. sold "Chymodiactin" in the course of defendant's business, and

Second, the "Chymodiactin" was then unreasonably dangerous when put to a reasonably anticipated use by defendant Richard Ashby, M.D. without knowledge of its characteristics, and

Third, defendant Smith Laboratories, Inc. did not give an adequate warning of the danger to defendant Richard Ashby, M.D., and

Fourth, the "Chymodiactin" was used in a manner reasonably anticipated, and

Fifth, plaintiff Ronald Pollard was damaged as a direct result of the "Chymodiactin" being sold without an adequate warning.

Smith Labs contends that the instruction should have required the jury to find that Smith Labs knew or reasonably should have known of the dangers of chymodiactin in order to find liability. Smith Labs' proposed instruction is set forth as follows:

Your verdict must be for the plaintiff Ronald Pollard and against defendant Smith Laboratories, Inc. if you believe:

First, defendant Smith Laboratories, Inc. sold "Chymodiactin" in the course of defendant's business, and

Second, the "Chymodiactin" was then unreasonably dangerous when put to a reasonably anticipated use by defendant Richard Ashby, M.D. without knowledge of its characteristics, and

Third, defendant Smith Laboratories, Inc. knew or reasonably should have known of the danger, and

Fourth, defendant Smith Laboratories, Inc. did not give an adequate warning of

---

3. Subarachnoid refers to a leakage of blood over the surface of the brain. The presence of the blood causes severe headaches and irritates the blood vessels. Frequently, this irritation causes a narrowing of the vessels, preventing adequate blood circulation and resulting in a stroke.

4. This was consistent with the findings of difficulty of speech with right hemiparesis (slight paralysis or weakening on the right side of the body).

the danger to defendant Richard Ashby, M.D., and

Fifth, the "Chymodiactin" was used in a manner reasonably anticipated, and

Sixth, plaintiff Ronald Pollard was damaged as a direct result of the "Chymodiactin" being sold without an adequate warning.

Plaintiffs argue that Smith Lab's proposed instruction would have impermissibly injected negligence into a strict products liability action.

Plaintiffs brought their action for actual damages against Smith Labs based upon Restatement (Second) of Torts section 402A (1977), also known as strict liability in tort.[5] The Missouri Supreme Court adopted section 402A as the law of this State in *Keener v. Dayton Electric Mfg. Co.*, 445 S.W.2d 362 (Mo.1969). Comment k to section 402A recognizes that certain useful and desirable products are incapable of being made safe for their intended and ordinary use. Restatement (Second) of Torts section 402A comment k (1977). Comment j to section 402A provides that in order to prevent an "unavoidable unsafe" product from being unreasonably dangerous, the seller may be required to give directions or warnings, on the container, as to its use. *Id.* Section 402A comment j. Otherwise, an injured party may have a cause of action based upon strict liability failure to warn. This court recognized such a cause of action in *Racer v. Utterman*, 629 S.W.2d 387, 393 (Mo.App., E.D. 1981). *See also* MAI 25.05 (1981).

In *Racer*, the plaintiff was admitted to the hospital for a gynecological procedure. During the course of the operation, a disposable drape caught on fire resulting in serious burns to plaintiff. The cause was submitted to the jury on a strict liability failure to warn theory. This court affirmed the jury's actual damage award and found the surgical drape to be an unavoidably unsafe product. *Id.* at 393. The defendant manufacturer argued that the jury should have been required to find that defendant had knowledge, actual or constructive, of the dangerous condition of which a warning is required. *Id.* at 394. This court rejected the argument stating that knowledge, fault or conduct of the defendant is not relevant in a strict liability cause of action. *Id.* at 395. The court acknowledged, however, that public policy might require that protection from strict liability be afforded to products such as drugs whose dangers are not only unknown but incapable of determination. *Id.* While not deciding the issue, the court indicated a willingness to afford protection to drugs based upon comment j to section 402A. *Id.*

Comment k to section 402A specifically addresses the application of strict liability to unavoidably unsafe products such as prescription drugs. Comment k states:

k. *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by

---

5. Section 402A provides:

Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Thus, comment k would impose liability on a drug manufacturer only if it failed to warn of dangerous propensities which it either knew or should have known. A number of jurisdictions have applied comment k to cases involving the liability of drug manufacturers. *See DeLuryea v. Winthrop Labs.*, 697 F.2d 222, 228–229 (8th Cir.1983); *Basko v. Sterling Drug, Inc.*, 416 F.2d 417, 425–26 (2d Cir.1969); *Chambers v. G.D. Searle & Co.*, 441 F.Supp. 377, 380–381 (D.Md.1975); *Stone v. Smith, Kline & French Labs.*, 447 So.2d 1301, 1303–1304 (Ala.1984); *Gaston v. Hunter*, 121 Ariz. 33, 588 P.2d 326, 338–341 (Ariz. App.1978); *Brown v. Superior Court (Abbott Labs.)*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 418–23, 751 P.2d 470, 477–81 (1988); *Johnson v. American Cyanamid Co.*, 239 Kan. 279, 718 P.2d 1318, 1323 (1986). One court that has considered the matter rejected the application of comment k. *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 654–57 (1st Cir.1981). The California Supreme Court noted that comment k focuses on the blameworthiness of the manufacturer, thus sounding in negligence and departing from strict liability. *Brown*, 245 Cal.Rptr. at 416, 417 n. 4, 751 P.2d at 475, 476 n. 4.

A number of policy reasons have been advanced as a basis for departing from strict liability in the area of prescription drugs. Holding drug manufacturers to a strict liability standard might deter research and development of new drugs or the distribution of available drugs that would prove beneficial. The cost of insurance will diminish the availability and increase the price of pharmaceuticals. Furthermore, withholding a drug from the market, beyond the delay required by the Food and Drug Administration, until scientific skill and knowledge advanced so that additional dangerous side effects might be revealed, would not serve the public interest. Drugs can save lives and reduce pain and suffering. Public policy favors the development and marketing of new drugs even though serious risks might accompany their introduction. Because of the public interest in the development, availability, and reasonable price of drugs, the standard set forth in section 402A comment k should apply in cases determining the liability of the manufacturer of an allegedly defective drug.

█ It is next incumbent upon this court to determine the scope of comment k in Missouri. Several courts have held that comment k applies to all prescription drugs. *See e.g. Brown v. Superior Court*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988); *McKee v. Moore*, 648 P.2d 21 (Okla.1982); *Woodhill v. Parke Davis & Co.*, 79 Ill.2d 26, 37 Ill.Dec. 304, 402 N.E.2d 194 (1980); *Terhune v. A.H. Robins Co.*, 90 Wash.2d 9, 577 P.2d 975 (1978). Other courts have limited its application to drugs shown to be incapable of being made safe given the present state of human knowledge but which have such a high degree of social need that their use is warranted, so long as there are sufficient warnings. *See e.g. Hill v. Searle Laboratories*, 884 F.2d 1064 (8th Cir.1989); *Kociemba v. G.D. Searle & Co.*, 680 F.Supp. 1293 (D.Minn. 1988); *Toner v. Lederle Laboratories*, 112 Idaho 328, 732 P.2d 297 (1987); *Belle Bon-*

*fils Memorial Blood Bank v. Hansen,* 665 P.2d 118 (Colo.1983). We agree with the latter view.

During the discussions of a draft of 402A, one member of the American Law Institute proposed that prescription drugs should be exempt from strict liability due to public policy concerns of encouraging research and testing. A motion on this proposal was defeated. 38 ALI Proc. 19, 90–98 (1961). Section 402A with comment k was adopted a year later at the next meeting of the Institute. 41 ALI Proc. 227, 244 (1962).

The language of comment k itself also militates against applying it to *all* prescription drugs. Comment k speaks of *"some"* products which are unavoidably unsafe; especially *"common"* in the field of drugs; the same being true of *"many"* new and experimental drugs. In addition, the examples given in comment k—for example, the Pasteur vaccine—suggest that only certain drugs fall within its design.[6]

■ Comment k requires that the product be "properly prepared, and accompanied by proper directions and warning...." Thus the comment, by its terms, only applies where there is an alleged design defect. Cases involving manufacturing defects or inadequate warnings do not invoke comment k protection. *Toner,* 732 P.2d at 305.

■ Where the case involves a design defect in a prescription drug, the burden shifts to the manufacturer to show that the drug falls within the realm of comment k protection. Thus, several states have held that the defendant must raise comment k as an affirmative defense. *Hill v. Searle*

*Laboratories,* 884 F.2d 1064, 1068 (8th Cir. 1989); *Toner v. Lederle Laboratories,* 112 Idaho 328, 732 P.2d 297, 307 (1987). These courts have held that there are two requirements to establish the comment k defense. First, the manufacturer must demonstrate that the drug's risk is "unavoidable." This is shown by demonstrating that, given the current state of knowledge, no feasible alternative design exists that would accomplish the same purpose with a lesser risk.[7] *Id.* at 306. Next, the manufacturer must demonstrate that the overall benefit of the drug outweighs the risk created by it.[8] This weighing must be done as of the time the product is distributed to the plaintiff.[9] *Id.* at 305–306. This balancing test is important in that "it does not serve society that an unavoidably unsafe product, which has occasional or fractious benefit should enjoy insulation from strict liability in tort when the product's predominant effects are detrimental to individual and public safety." *Willig,* the Comment k Character: A Conceptual Barrier to Strict Liability, 29 Mercer L.Rev. 545, 545 (1978). This court holds that comment k is an affirmative defense and its applicability must be determined by the trial courts on a case-by-case basis. *Hill v. Searle Laboratories,* 884 F.2d 1064, 1069 (8th Cir.1989); *Toner v. Lederle Laboratories,* 732 P.2d at 303–09.

■ Next we must decide how this holding affects the present case. Under Rule 55.08 Mo.R.Civ.P., a party must plead any "matter constituting an avoidance or affirmative defense." Any defense that the defendant intends to raise based on facts not necessary to support the plaintiffs' case must, therefore, be raised in the defendant's answer. *Shaw v. Burlington*

---

6. It is true that some of the policy behind comment k is limited by adopting this approach, but the court would rather follow this approach than grant carte blanche application to all drugs as done in the *Brown* case. See *Brown v. Superior Court,* 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988).

7. For this purpose, evidence of the comparative cost of alternative designs is important. In addition, evidence that this *particular* plaintiff would not have been injured by an alternative does not make the alternative safer. The risk must be measured by its severity and by the

effect it would have on the entire population of users.

8. In questionable cases, the trial court should strongly consider the public interest of increased protection for drug manufacturers.

9. This court declines to follow *Hill* to the extent that it applies this test to the drug in question. Lacking a fully developed record below, it is not this court's function to decide if this drug falls within comment k.

*Northern, Inc.*, 617 S.W.2d 455 (Mo.App., S.D.1981). In holding that comment is an affirmative defense, this court holds that it must be pleaded by the defendant at the earliest opportunity. In the present case, Smith Labs failed to allege the comment k defense until instructions were offered. Having failed to raise the comment k affirmative defense in a timely manner, the defense was waived. *Detling v. Edelbrock*, 671 S.W.2d 265, 271 (Mo. banc 1984). Point denied.

We will briefly address several other issues raised by Smith Labs on appeal.

 Smith Labs contends that the trial court allowed plaintiffs' expert to testify regarding a potential danger that was unsupported by the evidence. In his trial testimony, Dr. Sussman testified that it was his opinion that the plaintiff's spinal dura had been pierced twice, causing complications which resulted in the plaintiff's current state. Dr. Sussman also testified, however, regarding the danger that chymodiactin might enter the spinal fluid through a hole in the arachnoid around a nerve root.[10] Smith Labs, thus, contends that this testimony should have been excluded as irrelevant.

The trial court's determination of whether proffered evidence is relevant will be upheld on appeal absent a showing of abuse of discretion. *Iota Management Co. v. Boulevard Investment Co.*, 731 S.W.2d 399 (Mo.App., E.D.1987). In the plaintiff's amended petition, they asserted a cause of action in strict liability product defect as well as claims of strict liability failure to warn and negligent failure to warn.[11] To prove the claim of strict liability product defect, it was incumbent upon the plaintiffs to demonstrate, not only that chymodiactin caused his injuries, but also that it was "unreasonably dangerous when put to a reasonably anticipated use." See MAI 25.-05 (1981). The testimony of Dr. Sussman was relevant to this point and was likely to be of help to the jury. Thus, there was no error. See *School District of Independ-*

*dence v. U.S. Gypsum Co.*, 750 S.W.2d 442, 452 (Mo.App., W.D.1988); *Parlow v. Dan Hamm Drayage Co.*, 391 S.W.2d 315, 326 (Mo.1965).

 Smith Labs also contends that the trial court erroneously permitted plaintiffs to introduce evidence of post-injury remedial measures, subsequent warnings and tests occurring after plaintiff's injury. Generally, evidence of subsequent remedial measures is inadmissible in a negligence action. *Hefele v. National Super Markets, Inc.*, 748 S.W.2d 800, 803 (Mo.App., E.D. 1988). However, such evidence may be admissible for other purposes. Missouri courts, however, have never addressed the question of whether subsequent remedial measures are admissible in cases of strict liability. See *Keller v. International Harvester Corporation*, 648 S.W.2d 584, 588 n. 2 (Mo.App., W.D.1983); *Tennis v. General Motors Corporation*, 625 S.W.2d 218, 232 (Mo.App., S.D.1981).

The rule regarding the admissibility of post-accident remedial measures can best be stated by reference to Federal Rule of Evidence 407 which provides:

> When after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This Rule does not require the exclusion of evidence as subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment. Fed.R.Evid. 407.

In addition, the committee comment to this section provides in part: "The language used in this section is not intended as an expression of an opinion as to the admissibility of evidence of subsequent remedial measures in strict liability actions."

The reasons for prohibiting the admission of post-accident remedial measures to

---

**10.** See appendix.

**11.** At the close of the evidence the case was submitted to the jury only on the issue of strict liability failure to warn.

show negligence is twofold: (1) "If precautions taken could be used as evidence of previous improper conditions, no one, after an accident, would make improvements for that would be used against him," *Gignoux v. St. Louis Public Service Co.*, 180 S.W.2d 784, 787 (Mo.App., St.L.Dist.1944); and (2) that the changes are irrelevant as to what the previous condition was. *Id.*

The public policy concern behind Rule 407 has been subject to a great deal of criticism due to a lack of evidence that manufacturers would avoid correcting a defect and expose the public to further injuries if subsequent remedial measures could be used against them in a pending lawsuit. 2 Weinstein and Burger, Weinstein's Evidence par. 407[02], pp. 407–410 (1982); 23 Wright and Graham, Federal Practice and Procedure, Evidence, sec. 5285, pp. 93–94 (1980). As to the applicability of this public policy in strict liability cases, the California Supreme Court stated: "It is manifestly unrealistic to suggest that [the] producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effects upon its public image, simply because evidence of ... such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement." *Ault v. International Harvester*, 13 Cal.3d 113, 117 Cal. Rptr. 812, 816, 528 P.2d 1148, 1152 (1975). Other states have agreed.[12] *Dura Corp. v. Harned*, 703 P.2d 396 (Alaska 1985); *Jeep v. Murray*, 101 Nev. 640, 708 P.2d 297 (1985); *Klug v. Keller Industries, Inc.*, 328 N.W.2d 847 (S.D.1982); *Chart v. General Motors Corporation*, 80 Wis.2d 91, 258 N.W.2d 680 (1977); *Caldwell v. Yamaha Motor Co., Ltd.*, 648 P.2d 519 (Wyo. 1982). See also *Unterburger v. Snow Co., Inc.*, 630 F.2d 599 (8th Cir.1980). This line of reasoning, however, has not always been followed where the issue has been addressed in failure to warn cases. See e.g. *DeLuryea v. Winthrop Laboratories*, 697 F.2d 222 (8th Cir.1983); *Werner v. Upjohn Co., Inc.*, 628 F.2d 848, 856 (4th Cir.1980).

In *DeLuryea*, the plaintiff was given the drug Talwin for pain. The plaintiff became addicted to Talwin and developed severe ulcerations on her left thigh and necrosis on her right thigh and on her hips, shoulders, and upper arms. The trial court admitted evidence of a change in the warnings of a package insert for Talwin and the Court of Appeals reversed holding that Rule 407 applied since some form of culpability on the part of the manufacturer must be present in failure to warn cases.[13]

Missouri takes a different view of failure to warn cases than the *DeLuryea* court. In *Racer v. Utterman*, 629 S.W.2d 387 (Mo.App., E.D.1981), this court stated that "we are unable to see ... why a product dangerous because of an absence of warning, should receive different treatment than a product manufactured with the greatest of care which contains a defect unknown to the manufacturer ... we find it more useful to recognize that strict liability is not a traditional cause of action as it now exists and that knowledge, fault or conduct of the defendant is simply no longer relevant." *Racer*, 629 S.W.2d at 395. Thus, the culpability of the defendant is irrelevant and this court, therefore, will not follow *DeLuryea*.[14]

---

**12.** The Federal courts, however, have generally held that FRE 407 does apply in strict liability cases. See e.g. *Cann v. Ford Motor Co.*, 658 F.2d 54 (2nd Circuit 1981); *Werner v. Upjohn Company, Inc.*, 628 F.2d 848, 856 (4th Circuit 1980); *Oberst v. International Harvester Company, Inc.*, 640 F.2d 863 (7th Circuit 1980).

**13.** The court also relied on the fact that comment k applied. In the present case, we've decided that, due to their failure to plead comment k as a defense, comment k does not apply. This case is, therefore, considered to be one of strict liability. Had comment k applied, of course, Rule 407 would apply as comment k considers principles of negligence, not strict liability.

**14.** The *Racer* court noted that knowledge may be required where the product is a drug. This "knowledge" is part of comment k's protection that the defendant failed to plead. In addition, in this case, there was sufficient evidence below to find the defendant "by application of reasonable, developed human skill and foresight" had sufficient knowledge of the dangers of which the plaintiff alleged.

As to the second rationale behind the application of Rule 407, relevancy, this court believes that in strict liability cases, post remedial measures may be relevant. In strict liability cases, fault prior to the accident is not material. Instead, the question is whether or not there was a defect in the product when the plaintiff was injured. Subsequent repairs can be probative of this fact.[15] Thus, we find no error.

Smith Labs additionally asserts that the trial court erred in refusing to allow the jury to inspect certain trial exhibits. During deliberations, the jury requested certain exhibits including the package insert and warnings. Smith Labs argues that the warnings contained in the insert were central to the case and the trial court abused its discretion in refusing to allow the exhibits to go to the jury during deliberation. Trial courts have broad discretion in deciding which exhibits may be taken into the jury room. *See Woods v. City of Lake Lotawana*, 752 S.W.2d 869, 872 (Mo. App., W.D.1988). We do not find that the record supports an abuse of that discretion.

Smith Labs next argues that the trial court erred in admitting evidence of incidents in which other persons suffered from complications with chemonucleolysis without the required showing that the other cases were substantially similar to plaintiff's case. *See e.g., Wilson Court, Inc. v. Teledyne Laars*, 747 S.W.2d 239, 242 (Mo. App., W.D.1988). We find the reports themselves show a substantial similarity, sufficient for the purpose of proving that Smith Labs failed to adequately warn of even known risks.

Smith Labs also contends that plaintiffs' claims are preempted by Food and Drug Administration (FDA) regulations. FDA regulation does not preempt state law such as the duty to warn of risks inherent in a product. Furthermore, Smith Labs has failed to show congressional intent, express or implied, to preempt state tort law in the field of prescription drugs. We find no basis for ruling that plaintiff's claim is preempted by Federal law. See *Abbot v. American Cyanamid Co.*, 844 F.2d 1108 (4th Cir.1988).[16]

Affirmed.

SIMON, C.J., and STEPHAN, PUDLOWSKI and DOWD, JJ., concur with majority.

REINHARD, CRIST and KAROHL, JJ., concur.

SMITH, J., dissents in separate dissenting opinion.

SATZ, J., dissents and concurs in parts I–VII of dissenting opinion of SMITH, J.

CRANDALL, J., concurs in opinion of GARY M. GAERTNER, J.

CARL R. GAERTNER and HAMILTON, JJ., dissent and concur in opinion of SMITH, J.

GRIMM, J., dissents and concurs in parts I, III, IV, VII, and VIII of dissenting opinion of SMITH, J.

---

15. In many cases, the subsequent change may have been made for purposes other than safety. The trial court, in its discretion, can keep such evidence out. In addition, Rule 407 is still applicable where the probative value is greatly exceeded by the prejudice to the defendant.

16. Smith Labs' motion for leave to file a supplemental transcript on appeal is denied.

APPENDIX

ANATOMICAL TRANSPARENCIES

### 15. Spinal Cord

1. Medulla Oblongata
2. Cervical Region
3. Thoracic Region
4. Spinal Nerve
5. Spinal Ganglion
6. Sacral Region
7. Spinal Dura Mater
8. Dorsal Root of Nerve
9. Posterior Horn
10. White Matter
11. Gray Matter
12. Central Canal
13. Anterior Horn
14. Ventral Root of Nerve
15. Dura Mater
16. Subdural Space
17. Arachnoid
18. Pia Mater
19. Lumbar Region

AT-89

Copyright © 1971 By MATTHEW BENDER & Co., INC. (GRAY)

SMITH, Judge, dissenting.

I respectfully dissent.

I.

In *Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d 362 (Mo. 1969) our Supreme Court adopted 2 Restatement, Law of Torts, Second, Sec. 402A dealing with strict liability for products. The court identified three bases for the adoption of that section. The first was a policy matter identified in *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049 (1963) [4] as "the purpose of such liability is to insure that the cost of injuries resulting from defective products are borne

by the manufacturers [and sellers] that put such products on the market rather than by the injured persons who are powerless to protect themselves." The second basis was to free such litigation from the "shackles of warranty language" and the third was to give some sense of direction in products liability cases. Whether the third basis has been effectively achieved might be questioned.

Section 402A includes a series of comments explaining the origin, extent and application of the section. Comments a, b, and c essentially deal with the placement of the section, its history, and the policy reasons behind it, the last closely paralleling the first basis advanced in *Keener.* Comments d and e identify the types of products to which the section pertains. Comment f identifies the persons or entities upon whom the liability is imposed. Comments g, h and i define the scope and meaning of "defective condition" and "unreasonably dangerous". Comment i contains the language "Many products cannot possibly be made entirely safe for all consumption, and any food or drug *necessarily* involves some risk of harm, if only from overconsumption." (Emphasis supplied). Comments j and k then establish the requirements to be followed for those products which cannot be made entirely safe. Comment j creates the basis for what is commonly referred to as "failure to warn product liability cases" and verdict-director MAI 3d 25.05. Comment k deals with unavoidably unsafe products and states that "such a product if properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous." (Emphasis in original).

In *Racer v. Utterman,* 629 S.W.2d 387 (Mo.App.1981) we dealt with a surgical drape having inflammatory qualities. We rejected in that case a requirement that the jury be instructed on the defendant's knowledge of the dangerous condition. We premised that conclusion on the basic concept of products liability that the fault or negligence of the defendant is simply not relevant. We declined to apply the defensive warning language of comment j for two reasons. Initially we held that comment j as pertains to defendant's knowledge of the danger is limited to "those products which are either ingested or placed in contact with the body and where the injury results from the interaction of the product (or an ingredient of the product) with the body itself." Secondly we held the defensive warning language went beyond mere constructive knowledge to a level approaching, if not reaching, impossibility of knowledge. Neither situation applied to the drape in question nor the injuries resulting to plaintiff from its inflammability. As to the first basis we specifically reserved opinion on the applicability of the absence of knowledge of the manufacturer on his duty to warn in the case of drugs. The issue reserved in that case has not been subsequently resolved in Missouri.

## II.

As indicated, comment k deals with products delineated as unavoidably unsafe. It speaks particularly to drugs. Comment k, as heretofore indicated, states that an unavoidably unsafe product properly prepared and accompanied by proper directions and warning is not defective nor unreasonably dangerous. I can view comment k as nothing other than a statement of policy placing those types of products into a different treatment situation than other products. Comment j obviates the need of a warning (where knowledge, actual or constructive, is absent) only to those products where the danger is the result of interaction between the product and the human body itself. This is a reasonable approach. The vagaries of human reaction to products or ingredients contacting, or being ingested into, the human body are almost infinite. Such reactions are frequently indeterminable for many years or may arise because of unique susceptibility by such a limited portion of human beings that causal connection may be difficult to establish.

It is my belief that comment k and comment j were intended to afford a special protection to drug products and in so doing to inject into products liability cases involving prescription drugs a limited aspect of

negligence concepts. In that regard I am in agreement with the extensive and carefully crafted opinion in *Brown v. Superior Court (Abbott Laboratories)*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988). It should be noted that that opinion, holding all prescription drugs to be covered by comment k, was unanimously decided by the same court that originally established the concept of strict product liability in *Greenman v. Yuba Power Products, Inc., supra.* Comment k therefore provides freedom from liability to prescription drugs where they are properly prepared and adequate warnings are given. Such products are not under those circumstances defective or unreasonably dangerous. Comment j excuses warnings for such products if the manufacturer has no knowledge of the danger and by the application of reasonable, developed human skill and foresight could not have such knowledge.

In my opinion that protection extends to all prescription drugs and is not, as the majority holds, determined on a case by case basis. In that regard I find the reasoning in *Brown, supra*, persuasive. Unlike the majority I am unable to read the language of comment k as evidencing a case by case approach. The comments to the Restatement are obviously not statutes and there is considerable doubt that their interpretation should follow the more rigid requirements of statutory interpretation. They are simply explanations and expression of policy of the purpose and intent of the Restatement sections.

My interpretation of comment k is that it identifies a generic group of products entitled to comment k protection. Specifically those products include drugs and other unknown or unidentified products meeting comment k standards. Comment i specifically states that all drugs necessarily involve some risk of harm. The references to "many" in comment k refer to the many drugs to which a known risk attaches and distinguishes those from drugs having no known risk or which have been determined to be safe, if such a determination can ever be definitively made.[1] It does not refer to the question of the efficacy or value of the drug. This is evident by the reference in comment k to "many of which for this very reason [inherent potential of harm] cannot legally be sold except to physicians, or under the prescription of a physician." Clearly that language is directed to risk, not to the overall value of the drug. The same is true of the reference to new and experimental drugs.

Prescription drugs, almost by definition, possess the potential of risk to some patient under some circumstances. Drugs must be dispensed by prescription if they (1) are habit forming, or (2) because of toxicity or other potential for harmful effect are not safe for use except under supervision of a medical practitioner, or (3) are new. 21 U.S.C.A. Sec. 353(b)(1). New drugs can be authorized for prescription dispensing if they have tested out to be effective and safe for use under the conditions prescribed, recommended or suggested in the proposed labeling. 21 U.S.C.A. Sec. 355(d). The evaluation and balancing of efficacy and safety is vested with the Federal Drug Administration. I question the authority of a court, applying the case by case approach upheld by the majority, to evaluate that balance between efficacy and safety or between safety and usefulness. *United States v. Articles of Drug–Hormonin*, 498 F.Supp. 424 (D.C.N.J.1980) [1–6].

Further, prescription drugs are to be utilized by trained medical professionals for treatment of patients' medical problems. Under concepts of informed consent the patient is presumably advised of the identified dangers from the drug and in consultation with his physician makes the balancing determination between benefits and danger. To apply a case by case analysis to the applicability of comment k to prescription drugs is to place a court in a position of second-guessing the FDA, the physician and the patient. As a matter of both policy and authority I am unable to conclude that courts should engage in such a balancing test. As to all prescription drugs I would hold that comment k applies and that an

---

**1.** Obviously, a totally safe drug does not need comment k protection as it creates no liability.

element of plaintiff's proof is that the manufacturer failed to warn of a danger actually or constructively known. It is also apparent that the balancing test is impossible if the potential danger is unknown and incapable of determination. If only the benefit is known there is nothing to balance except the possibility of some unknown danger of unknown seriousness. The purpose of comments j and k is to protect the drug manufacturer from liability for such unknowns.

### III.

I further am in disagreement with the majority that absence of knowledge is an affirmative defense. Comment k specifically states that unavoidably unsafe products properly prepared and accompanied by proper directions and warning are neither defective nor *unreasonably* dangerous. Sec. 402A liability is premised upon a defective product unreasonably dangerous to the user or consumer. If the product is neither then liability does not exist. Comment k authorizes, without liability, distribution of prescription drugs properly prepared and accompanied by proper directions and warnings. Under comment j warning is only required of dangers which are actually or constructively known. Comment k, therefore, as to prescription drugs injects negligence concepts into product liability claims involving those products. *Brown v. Superior Court (Abbott Laboratories), surpa,* [1]. An essential element of plaintiff's burden is to establish a failure to warn of a danger known actually or constructively.[2] Failure to establish that element is fatal in a failure to warn case involving prescription drugs. I would have no difficulty in holding that a plaintiff makes a prima facie case upon proof of the absence of a warning of a danger in the drug thereby shifting the burden of going

forward to the defendant. Just as in res ipsa loquitur and rear-end collision cases such shifting does not, however, change the ultimate burden of proof from plaintiff to defendant. *McCloskey v. Koplar,* 329 Mo. 527, 46 S.W.2d 557 (banc 1932) [3, 6]; *Barlow v. Thornhill,* 537 S.W.2d 412 (Mo. banc 1976) [7, 8]. Such shifting of the burden of going forward does not convert an essential element of plaintiff's case into an affirmative defense. An affirmative defense is "matter constituting a defense; new matter which assuming the complaint to be true, constitutes a defense to it." *Black's Law Dictionary,* 5th Ed. Comment k by premising defendant's liability on negligence concepts requires that plaintiff bear the ultimate burden of establishing defendant's knowledge of the dangerous condition about which it failed to warn. I do not regard comment k as an affirmative defense.[3]

### IV.

Even assuming the majority opinion is correct on the first two issues (case by case approach and affirmative defense) I have great difficulty concluding that defendant waived the issue of its knowledge of the danger. In their second amended petition plaintiffs stated, in connection with an allegation supporting punitive damages, that defendant knew of the danger of which it failed to warn. Defendant denied that allegation. The issue of defendant's knowledge of a danger greater than that of which it warned was litigated throughout the trial.

No case in this state had ever determined the applicability of comment k to prescription drugs and whether comment k constitutes an affirmative defense. Plaintiffs made no assertion in their brief here that the matter had been waived. Their only

---

**2.** The constructive knowledge requirement of danger is different from the usual negligence case. There is constructive knowledge if "by the application of reasonable, developed human skill and foresight" the manufacturer should have known of the danger. 402A comment j.

**3.** The majority opinion implies at least that the element of knowledge had it not been waived

would properly be included in plaintiff's verdict-directing instruction. MAI 25.05 utilized in this case does not address knowledge. But MAI 25.06 which is comparable as to the knowledge feature does include defendant's knowledge. Affirmative defenses are not included in a plaintiff's verdict-director; they are separately instructed on. MAI 3d 32.00.

reference to the subject of affirmative defense was that by enactment of Secs. 537.-760 through 537.764 the general assembly had established "state of the art" as an affirmative defense in failure to warn cases. This purportedly established the public policy of the state and this purportedly affirmed that prior to enactment of the statute no duty existed on plaintiff's part to establish defendant's knowledge of the danger. The statute in question did not become effective until shortly before trial and considerably after the plaintiff's injury and all the pleadings had been filed. The statute legislatively overruled the decision of *Elmore v. Owens–Illinois, Inc.*, 673 S.W.2d 434 (Mo. banc 1984). *Elmore* did not involve a comment k product. The statute has created an affirmative state of the art defense as to non-comment k products. Comment k combined with comment j have always contemplated a knowledge requirement as an element of a case involving a prescription drug.[4] I am unable to glean from the statute or from the prior case law in this state any basis for defendant to anticipate that invocation of comment k required an affirmative defense.

*Racer, supra* indicated that comment j combined with comment k might cover a prescription drug case and gives no indication that they must be raised as an affirmative defense. In *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371 (Mo. banc 1986) two judges observed the difference between usual products liability cases and drug cases as to the question of the manufacturer's knowledge. l.c. 389 (Blackmar concurring) l.c. 394 (Welliver dissenting). The language of comment k can reasonably be interpreted as making defendant's knowledge of the danger to be warned against an essential element of the plaintiff's case. The pleadings placed the matter at issue. The case was tried at least in part on the issue of defendant's knowledge. The majority opinion acknowledges that the defendant's knowledge was a relevant issue in the case unless waived. Under those circumstances I find it unfair to affirm this large judgment on the basis of a waiver of what the majority acknowledges is a relevant issue.

### V.

I am also in disagreement with the majority conclusion concerning Dr. Sussman's testimony involving danger from injection into the nerve root dural sleeve. The warning on the package insert stated: "The drug is extremely toxic when injected intrathecally in animals. Therefore great caution must be exercised in assuring that chyrodiactine is not injected intrathecally into the dural canal." This warning was repeated a second time with specific reference to the dural canal in the human. Dr. Sussman and other experts were agreed that the drug entered the dural canal because the doctor injecting the drug pierced the spinal column dural sleeve. Dr. Sussman testified that the drug could also enter the spinal fluid if the physician pierced the nerve root dural sleeve. This he testified did not happen. He then, however, premised his opinion upon the dangerousness of the drug and the inadequacy of the warnings upon the difficulty of avoiding the nerve root dural sleeve. Dr. Sussman testified by deposition. His testimony concerning the nerve root dural sleeve was objected to and the objection was overruled with a court-granted continuing objection to testimony concerning the nerve root dural sleeve.

As an explanation of one of two ways in which the drug could contaminate the spinal fluid I have no objection to Dr. Sussman's testimony. But when he was then allowed to testify that it was the potential of nerve root dural sleeve puncture that rendered the drug dangerous and the warnings inadequate his testimony became irrelevant and objectionable.

The danger hypothesized by Dr. Sussman was totally unrelated to the injury suffered by plaintiff. Plaintiff was not injured because the nerve root dural sleeve was pierced. Had that potential been the subject of warning plaintiff would still

---

**4.** I make no judgment as to whether the statute now makes knowledge an affirmative defense in a comment k case, or whether knowledge remains an element of plaintiff's case.

have sustained his injury. While the requirements of proximate cause have been relaxed (*Jackson v. Ray Kruse Construction Company, Inc.*, 708 S.W.2d 664 (Mo. banc 1986)) I am not aware that they have been totally eliminated. There must still be a correlation between the danger and the plaintiff's injury. *Myers v. Bi–State Development Agency*, 567 S.W.2d 638 (Mo. banc 1979) [5, 6]; *Butcher v. Main*, 426 S.W.2d 356 (Mo.1968) [3, 4]. It does not do to contend, as the majority does, that once a drug has been identified as being dangerous that any and all injuries arising from use of that drug are compensable, whether arising from that danger or not. Unless the danger is related to the injury the evidence of the danger is irrelevant and should not be admitted. In this case I cannot conclude that the admission of this testimony was harmless.

### VI.

I find it unnecessary to discuss at length other issues involved on the appeal. I will comment that the discussion in the majority opinion concerning post-injury remedial measures is premised upon the majority's conclusion that this is not a negligence action. To the degree that comment k injects into prescription drug product liability cases the element of defendant's knowledge, and therefore negligence, the majority conclusion fails. In that posture *DeLuryea v. Winthrop Laboratories*, 697 F.2d 222 (8 Cir.1983) is persuasive. As previously stated *Racer v. Utterman, supra* did not reject negligence concepts in a prescription drug case. It specifically reserved that question. It does not therefore preclude the application of *DeLuryea*.

### VII.

I note in passing that I find it most unusual that in a case based upon an inadequate warning the court would refuse the jury's request to examine the actual instructions and warning, three and one half pages in length.

### VIII.

Despite our understandable desire to compensate persons for injuries they have incurred through no fault of their own, it is also important that we recognize the social consequences of our decisions on the public generally. We do not benefit that public by making beneficial products, particularly prescription drugs designed to provide relief or cure from disease and suffering, economically unavailable because of possible unknown risks and subsequent large liability awards. Our holding herein does not, in my opinion, uphold public policy. I do not believe this defendant has received a fair trial. I would reverse and remand.